[Cite as *In re Estate of Lynch*, 2010-Ohio-6376.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## WYANDOT COUNTY

IN THE MATTER OF:

    THE ESTATE OF                        CASE NO. 16-10-05
    DASHELLE LYNCH,

DARLENE LYNCH

                                  **O P I N I O N**

    APPELLANT.


Appeal from Wyandot County Common Pleas Court
Probate Division
Trial Court No. 071079

**Judgment Affirmed**

**Date of Decision:**    December 27, 2010


APPEARANCES:

    *Kurt A. Dauterman* **for Appellant**

    *Paul F. Burtis* **for Appellee, Wayne Lynch**

**ROGERS, J.**

{¶1} Mother-Appellant, Darlene Lynch, appeals from the judgment of the Court of Common Pleas of Wyandot County, Probate Division, approving a $500,000 settlement amount on a wrongful death claim pertaining to her deceased daughter, Dashelle Lynch, and distributing $2,000 of the settlement amount to her, with the remainder being distributed to Dashelle's Father, Wayne Lynch, after the payment of attorney fees, court costs, and Medicaid bills. On appeal, Darlene argues that the trial court erred in failing to find that both parents were entitled to a presumption that the proceeds from the wrongful death claim settlement should be distributed equally pursuant to R.C. 2125.02, and that the trial court abused its discretion in distributing to her only $2,000 of the wrongful death claim settlement. Based on the following, we affirm the judgment of the trial court.

{¶2} In August 2007, Wayne filed an application to administer the estate of Dashelle, who tragically died in an apartment fire. Within the application, Darlene was listed as Dashelle's mother and as a party entitled to inherit under the statutes of descent and distribution.

{¶3} In September 2007, Darlene filed a waiver of her right to administer the estate.

{¶4} Subsequently, Wayne filed four applications to extend the administration of the estate, in April 2008, August 2008, February 2009, and August 2009, due to his pursuit of a wrongful death action on Dashelle's behalf, and the trial court granted each application.

{¶5} In April 2010, Wayne filed an application to approve the settlement amount and distribution of the wrongful death claim, with the settlement amount being $500,000, to be distributed as follows: $123,495 for subrogation of a Medicaid lein, $200,000 in attorney fees, $26,973.83 in case expenses, and the remaining $149,531.17 to be distributed to him, with Darlene receiving no share in the settlement.

{¶6} In May 2010, a hearing was held on the application for distribution, at which Karen Behm testified that she was serving as the attorney for the estate of Dashelle and previously served as Wayne's attorney in his divorce from Darlene; that Wayne and Darlene were divorced in 1998, and, pursuant to a separation agreement, Darlene was the residential parent of Dashelle; that, in 2000, Wayne informed her that Darlene had left Dashelle on his doorstep at 6:00 a.m. without informing him prior that she was going to do so; that she subsequently filed a motion to re-allocate parental rights, and a consent agreement was signed by the parties stating that Wayne would have residential parent status, Darlene would have no contact with Dashelle unless Dashelle initiated the contact, and Darlene

would not be responsible for child support payments; that, in 2001, she received a letter from Donald Bennett, an attorney representing Darlene, indicating that Darlene was "at her wits-end with regard to how to approach her daughter," and requesting that Wayne be willing to consider stepparent adoption, even if it did relinquish Darlene of her parental rights, because "there seem[ed] to be no way to effectively exercise parental rights, [and she] believed the time [had] now come to call Dashelle's bluff" (application for distribution hearing tr., p. 46); that, subsequently in 2001, Darlene forwarded a letter to Dashelle through the guardian ad litem at the time, and she (Behm) sent a letter to the guardian ad litem and Darlene requesting Darlene have no contact with Dashelle pursuant to the no contact order in the consent agreement; that she filed a motion for emancipation for Dashelle in 2004 when she turned eighteen, as Dashelle wanted to move out of Wayne's home; that Wayne had concerns about Dashelle not graduating from high school, but she wanted to live on her own; and, that, according to the judgment entry filed in the case, Darlene was not present and did not respond to the motion hearing.

{¶7} Joseph O'Neil testified that he represented Dashelle's estate and next of kin in the wrongful death action; that Wayne answered the eleven page questionnaire he prepared regarding damages in the action, and Wayne also assisted in responding to interrogatories and gave deposition testimony; that

Wayne also agreed to be responsible for the costs of litigation if there was no recovery; that he thought Wayne was "a sincere, sad father who * * * didn't like the way his daughter died and didn't want somebody else to die the same way, and he was going through a lot of pain" (id. at 72); that he also sent the eleven page questionnaire to Darlene; that Darlene did not complete the questionnaire, but called to speak with him; that Darlene asked about the case, including the potential amount of recovery, and she indicated that "she didn't think anything would be there and she really did not wanna [sic] pursue the matter or get involved with it" (id. at 73); that he also sent Darlene interrogatories for the case, but she did not answer them; that he did not get the impression that Darlene was a "sincere, sad mother" (id. at 81); and, that he did not believe Darlene would have been a good witness to the damages part of the case.

{¶8} Wayne Lynch testified on direct examination that, when he and Darlene divorced, Darlene was the residential parent of Dashelle, and he had visitation and paid child support; that there was a period of time where Dashelle did not want to see him, but he did not force her, and she eventually started visiting him again; that, in June 2000, he and his wife were awakened by Dashelle knocking at the door early in the morning; that Darlene had dropped off Dashelle without notifying him, and Darlene was gone when he answered the door; that he subsequently became the residential parent; that Dashelle lived with him while she

was in high school up until her senior year; that, at age eighteen, Dashelle chose to leave high school before graduating against his wishes; that, while in high school, Dashelle played volleyball and was in National Honor Society; that he and Dashelle went to football games together, and he and his wife taught her how to drive when she turned sixteen; that he had rules that Dashelle had to follow, but she "never gave [him] a problem" (id. at 95); that, during Dashelle's senior year of high school, he received a phone call from the school informing him that Dashelle had been missing school; that he was not aware Dashelle was missing school because she drove herself to school and would leave and return home at the correct time; that, after a meeting with school counselors, Dashelle decided to quit school and move out on her own; that there were no fights between him and Dashelle that caused her to leave; that he filed paperwork so Dashelle could be emancipated from him and Darlene; that, after she left home, he would still communicate with her "as much as she would allow" (id. at 97); that Dashelle would come to family holiday gatherings and would sometimes call and ask for help and support; that, subsequently, Dashelle and her boyfriend, Mike, came over to his house, and Mike asked for his permission to marry Dashelle; and, that they came over his house on one other occasion, and he (Wayne) also helped put kitchen cabinets in their house.

{¶9}   Wayne further testified that Dashelle had essentially no contact with her mother while she was in high school; that she may have written letters to Darlene, but he "didn't know that if she did" (id. at 100); that Dashelle "had conflicting ideas of her mother" and chose not to visit her (id.); that he did not force Dashelle to visit Darlene, but he always instilled in Dashelle that Darlene was her mother and would always be her mother; that, when he heard about Dashelle being injured in the fire, he left his office, went home to pick up his wife, and immediately proceeded to the hospital; that, while at the hospital, he overheard Darlene state that she had not seen Dashelle for six months; that he made the medical decisions for Dashelle; that he goes to her grave site every Sunday and the 17th and 23rd of every month; that he proceeded with Dashelle's wrongful death lawsuit because he wanted someone to be held responsible for her death; that, when consulting with O'Neil, he was told that there may be no recovery in the lawsuit, and he agreed to be responsible for the legal fees if there was no recovery; and, that Dashelle was a "special child" and "his buddy." (Id. at 105-106).

{¶10} Wayne testified on cross-examination that there was never a time where he forbid Dashelle from calling Darlene, and he was not aware of a letter Dashelle wrote to Darlene making that claim; that he did not ask Darlene what she wanted to do for Dashelle's funeral arrangements; that he never discussed with

Darlene his application to be appointed guardian of Dashelle; that he visited Dashelle in the hospital every day, and Darlene was there most days also; and, that he did not see Darlene crying at Dashelle's funeral. Subsequently, Wayne read three letters written by Dashelle to Darlene indicating that Dashelle missed Darlene; that Dashelle asked Wayne if she could visit Darlene but Wayne would not allow it; that Dashelle was anxious to turn eighteen so she could leave Wayne's house; that she wanted Darlene to go to court and tell them that Wayne was not allowing her to see Darlene; that Dashelle was sorry for hurting Darlene in the past; that she thought about Darlene everyday; and, that she loved Darlene.

{¶11} After the presentation of Wayne's evidence, Darlene moved for a directed verdict[1], alleging that Wayne failed to establish that Darlene abandoned Dashelle, and the trial court overruled the motion.

{¶12} Michael Fox testified that he was Dashelle's former fiancé; that he and Dashelle were engaged in 2006 and were planning the wedding for July 7, 2007; that, while they were engaged, he and Dashelle would regularly visit Darlene in her home; that they visited her at least a dozen times; that they also visited Wayne's residence on two occasions during their engagement; that he and Dashelle called off the wedding in May 2007 because Dashelle was seeing another man; that Dashelle and Darlene had a disagreement due to the Dashelle's

---

[1] We note that a motion for a directed verdict is proper only in a jury trial, not a bench trial. See *Wallbrown v. Kent State Univ.* (2001), 143 Ohio App.3d 762, 767.

behavior; that he believed Wayne and Darlene loved Dashelle equally; that Dashelle would have arguments and disagreements with both Wayne and Darlene; and, that, from the time he knew Dashelle, he did not believe Darlene engaged in any behavior that could be characterized as abandoning Dashelle.

{¶13} Lynn Crosby testified that he lived with Darlene; that he has known Darlene since 1998; that he was present the day that Darlene took Dashelle to Wayne's house early in the morning; that Dashelle had asked to "start [her] summer vacation with [her] dad," as she usually spent six weeks with Wayne during the summer, because Darlene disciplined her for staying out all night with an older man (id. at 141); that Darlene told Dashelle she could go to Wayne's, and instructed Dashelle to call Wayne; that Dashelle stated she called her father and obtained permission, and she proceeded to pack her clothing; that the following morning, he and Darlene drove Dashelle to Wayne's residence; that they parked in the driveway as Dashelle went to the front door; that he could not remember if he saw Wayne answer the door, but they drove off after that saw Dashelle had gained entry into the residence; that Darlene expected Dashelle to return after she spent the six weeks with Wayne; that Darlene did not agree to allow Dashelle to stay with Wayne, but he believed a Magistrate ordered that Dashelle was old enough to decide where she wanted to live; that, while Dashelle was living with Wayne, she would visit Darlene; that he was present on multiple occasions when Dashelle

would visit; that, after Dashelle turned eighteen, her relationship with Darlene "had ups and downs" (id. at 145); that Darlene and Dashelle would do things together, but that Dashelle would get upset with Darlene when Darlene would tell her she was not living her life correctly, and Dashelle would not speak with Darlene for two or three months; that Dashelle and Mike visited on several occasions and would stay for several hours at a time; and, that, after Dashelle passed away, Darlene informed him that, because Wayne had a power of attorney, Wayne made all the decisions regarding Dashelle's funeral and she was never asked anything.

{¶14} Darlene Lynch testified that Dashelle was very "head strong" and independent (id. at 154); that she did not contact Wayne before she dropped Dashelle off at his house because she was not allowed to contact him under the terms of the civil protection order in place at the time; that, a few days before she dropped off Dashelle at Wayne's residence, she contacted the police because she could not locate Dashelle; that, after Dashelle came home, she grounded her; that, shortly thereafter, Dashelle informed her that she wanted to start her summer vacation with Wayne, and that if she did not allow Dashelle to go, she would be in contempt if court; that she told her she needed to ask Wayne, and Dashelle went upstairs and called him; that Dashelle informed her that Wayne gave her permission to come over, and Dashelle began packing; that Dashelle did not return

to her home after the summer vacation, and, when she attempted to call Wayne, "the phone was just slammed" (id. at 160); that, by the end of the summer, Wayne filed for custody of Dashelle, and she consented to it because Dashelle told her "I'm always gonna love you * * * I'm gonna tell 'em I wanna see you, everything's going to be fine.  * * * I'll still be seeing you" (id. at 161); that she did not attempt to contact Wayne on other occasions regarding Dashelle because she "knew he'd have Karen Behm on [her]" (id. at 158); that, after Dashelle began living with Wayne, Dashelle would sneak to visit her because Wayne would not allow visitation; that Dashelle also kept in touch with her by writing several letters; and, that she did not file contempt charges against Wayne for failing to permit Dashelle to visit because she could not afford to have an attorney represent her.

{¶15} Darlene continued that, after Dashelle was emancipated at age eighteen, Dashelle visited her more frequently; that Dashelle also invited her to her house on multiple occasions; that she assisted Dashelle financially by purchasing household items for her, such as food, shampoo, and toilet paper; that she and Dashelle had a very good relationship while Dashelle was engaged to Mike; that, on one occasion, she and Dashelle went shopping for Dashelle's wedding dress, and, during the course of the day, she discovered that Dashelle was having an affair with another man; that, when she confronted Dashelle, Dashelle

became upset and did not want to speak with her; that she attempted to contact Dashelle numerous times, but Dashelle refused to speak to her; that the incident marked the last time she and Dashelle spoke; that Wayne did not want her visiting Dashelle in the hospital; that there was an occasion while visiting Dashelle in the hospital that security had to be called so she could visit Dashelle; that she visited Dashelle every day that she was in the hospital; that Wayne never consulted her regarding Dashelle's funeral arrangements; that she did not offer any suggestions for a funeral because she was not allowed; that Wayne used to intimidate her; that someone contacted her regarding the wrongful death lawsuit, but she did not want to get involved because she was grieving; that there were days where she was not able to get out of bed; and, that she received mental health counseling two days per week after Dashelle's death and was continuing to receive counseling once per month.

{¶16} In June 2010, the trial court issued a judgment entry, stating, in pertinent part, as follows:

> **The amount of the settlement is Five Hundred Thousand Dollars ($500,000) and the Court hereby approves same.**
>
> **\* \* \***
>
> **Courts who have dealt with the issue of the distribution of settlement proceeds as between individuals of equal consanguinity have found little authority in Ohio to assist in construing the applicable statutes. "However, it is quite apparent from its language that the statute was intended to vest**

discretion…[in a] court in apportioning distribution in accordance with established principles of equity, without regard to the statute of descent and distribution, and without regard for any precise mathematical formula." <u>In Re Estate of Cline</u> (1964), 1 Ohio Misc. 28, 30. With these statutes and concepts in mind the Court undertakes its analysis in this matter.

Mother's willingness to unburden herself of Dashelle when she was 14 years of age and neither requesting contact with Dashelle nor paying child support for her bespeaks of a serious disconnect in the mother child relationship. This disconnect is also evident when one considers that mother was willing to have Dashelle adopted by another which would have completely terminated Mother's parental rights. Mother claims some communication with Dashelle while Dashelle was in high school but there is little evidence of the same. Following her emancipation, it does appear that there was approximately a one year period where Dashelle enjoyed a healthier relationship with her mother, but approximately ten months prior to her death they had once again stopped speaking due to some argument. Darlene had never been to the apartment that Dashelle occupied just prior to her death. By contrast, father, when not the custodial parent, enjoyed visitation with Dashelle and paid child support on her behalf. He described it as unexpected [sic] yet pleasant surprise when Dashelle was abruptly dropped off at his house by mother in the early morning hours. Thereafter he sought and obtained residential parent status of Dashelle. It appears father and Dashelle had a typical father daughter relationship in that they engaged in activities together. Father proudly recounted some of the accomplishments of his daughter and was positive about her. While father said they went for a [sic] short periods of time without speaking because father disapproved of a relationship in which Dashelle was engaged, it appears that neither of them could maintain a lengthy break in their relationship. Father provided services for Dashelle, he seemed aware of what was occurring in her life and it appears Dashelle desired to keep her father in her life as shown by her comments to him concerning the Fathers Day holiday just prior to her death. More importantly, in her last conscious moments Dashelle was shaking her head "no" and not wanting her father

to leave her when the hospital nurses had instructed him to do so. Father's grief over the death of his daughter appeared genuine and ongoing. When asked, he advised that he visits Dashelle's grave every Sunday, every 17th of the month presumably in recognition of the date on which she died, and every 23rd of the month for reasons unknown to this Court but obviously [sic] to father. Father took it upon himself to become obligated to pay the funeral bill and took all the financial risks associated with this case in order to bring justice to "those girls which [sic] could not escape the building." Father hired attorneys, participated in the case, answered interrogatories, completed the questionnaire and appeared for deposition.

By contrast, mother upon questioning an attorney handling the Wrongful Death Action, concluded there would be no money and therefore declined to participate in the case. Counsel in the wrongful death action determined her lack of participation was a positive because mother did not strike him as a sad, grief stricken mother. By contrast he described father as an individual going through a lot of pain.

Mother, according to father, did not cry at the hospital and did not cry at the funeral home. Mother was heard to wail in the courtroom during father's testimony, but the genuineness of her sounds were questioned given how quickly they erupted and how quickly they faded when no attention was paid to them. Mother's cold demeanor on the stand seemed odd when one considers the magnitude of the loss. The Court is mindful that [sic] the fact that everyone grieves in his or her own way. It is likely that both of Dashelle's parents loved her in his or her own way. But in terms of loss it is quite apparent that father, as opposed to mother, is suffering the greater mental anguish and much more keenly feels the loss of this daughter's companionship and society. Father took action to address what was done to his daughter, while mother sat back and did nothing, not even filling out a questionnaire to assist in gaining justice for her daughter. Only when mother was assured that there was money to be distributed did she choose to participate. The Court believes that this is a sad time for both parents; father for what he has lost and mother for the regrets she might

**have for what might have been. In considering all of the foregoing the Court orders the following distribution:**

**1. There is a funeral bill owing to Harold Floriana Funeral Home, 301 West Tiffin St., Fostoria, Ohio 44830 in the gross amount of $8,035.53. Father has paid some toward that debt and therefore father shall be reimbursed for any amounts he has spent on the funeral and any amount still owing shall be paid directly to the funeral home out of the settlement proceeds.**

**2. Attorney fees to Attorney Joseph O'Neil and Karen Behm shall be paid in the sum of $200,000.00 plus case expenses in the sum of $26,973.83. The lien by Medicaid in an amount no greater than $125,000.00 shall be paid and if a lesser amount is negotiated, the difference between the $125,000.00 and that which is actually paid to Medicaid, shall be paid over to Dashelle's father, Wayne Lynch. As to the remaining proceeds mother Darlene Clark shall receive the sum of $2,000.00 and all of the remainder of the proceeds shall be paid to father, Wayne Lynch.**

(June 2010 Judgment Entry, pp. 1, 8-10).

{¶17} It is from this judgment that Darlene appeals, presenting the following assignments of error for our review.

*Assignment of Error No. I*

**BOTH PARENTS HAVE THE SAME LEVEL OF CONSANGUINITY AND THE PRESUMPTION UNDER ORC 2105.02 [SIC] IS THAT BOTH ARE ENTITLED TO EQUAL SHARE OF ANY DISTRIBUTION.**

*Assignment of Error No. II*

**THE COURT ABUSED IT'S [SIC] DISCRETION IN AWARDING DECEDENT'S FATHER, WAYNE LYNCH 98.6% OF THE WRONGFUL DEATH PROCEEDS GIVEN THE FACTS AND TESTIMONY PRESENTED DURING THE**

**HEARING PROVES BOTH PARENTS HAD SIMILAR PATTERNS AND OR TYPES OF RELATIONSHIP [SIC] WITH THEIR DECEASED ADULT DAUGHTER, DASHELLE LYNCH.**

*Assignment of Error No. I*

{¶18} In her first assignment of error, Darlene argues that the trial court erred in failing to start with a rebuttable presumption that both parents were entitled to an equal share in the distribution of the wrongful death claim settlement proceeds. Specifically, Darlene contends that R.C. 2125.02[2] establishes that parents are to share equally in the wrongful death claim proceeds, and that evidence must be presented establishing one parent did not suffer or suffered less damages in order to divest that parent of an equal share. We disagree.

{¶19} An appellate court reviews the trial court's application of the law de novo. *Heritage Court v. Merritt*, 187 Ohio App.3d 117, 2010-Ohio-1711, ¶13; *State v. Helms*, 7th Dist. No. 08 MA 199, 2010-Ohio-4872, ¶79. R.C. 2125.02 governs wrongful death claims and provides, in pertinent part, as follows:

> **(A)(1) Except as provided in this division, a civil action for wrongful death shall be brought in the name of the personal representative of the decedent for the exclusive benefit of the surviving spouse, the children, and the parents of the decedent, all of whom are rebuttably presumed to have suffered damages by reason of the wrongful death, and for the exclusive benefit of the other next of kin of the decedent. A parent who abandoned a**

---

[2] We note that Appellant's brief cites to R.C. 2105.02, not the relevant section R.C. 2125.02. However, we find this to be a typographical error, and one which Appellant corrected in her reply brief, properly citing R.C. 2125.02.

**minor child who is the decedent shall not receive a benefit in a civil action for wrongful death brought under this division.**

**(2) The jury, or the court if the civil action for wrongful death is not tried to a jury, may award damages authorized by division (B) of this section, as it determines are proportioned to the injury and loss resulting to the beneficiaries described in division (A)(1) of this section by reason of the wrongful death and may award the reasonable funeral and burial expenses incurred as a result of the wrongful death. In its verdict, the jury or court shall set forth separately the amount, if any, awarded for the reasonable funeral and burial expenses incurred as a result of the wrongful death.**

**{¶20}** R.C. 2125.02(A)(1), (2).

**{¶21}** Moreover, R.C. 2125.03 governs the distribution of the proceeds

from a wrongful death claim, and provides, in pertinent part, as follows:

**The amount received by a personal representative in an action for wrongful death under sections 2125.01 and 2125.02 of the Revised Code, whether by settlement or otherwise, shall be distributed to the beneficiaries or any one or more of them. The court that appointed the personal representative, except when all of the beneficiaries are on an equal degree of consanguinity to the deceased person, shall adjust the share of each beneficiary in a manner that is equitable, having due regard for the injury and loss to each beneficiary resulting from the death and for the age and condition of the beneficiaries. If all of the beneficiaries are on an equal degree of consanguinity to the deceased person, the beneficiaries may adjust the share of each beneficiary among themselves. If the beneficiaries do not adjust their shares among themselves, the court shall adjust the share of each beneficiary in the same manner as the court adjusts the shares of beneficiaries who are not on an equal degree of consanguinity to the deceased person.**

R.C. 2125.03(A)(1).

{¶22} R.C. 2125.02(A)(1) provides a rebuttable presumption that the surviving spouse, children, and parents of the decedent have suffered damages as the result of the decedent's death. *Heise v. Orra*, 8th Dist. No. 66172, 1995 WL 79794. Nowhere in R.C. 2125.02 or 2125.03 is language which could be interpreted to provide a rebuttable presumption of equal distribution of the proceeds, as Darlene contends, and she cites us to no authority finding such presumption. On the contrary, the language of R.C. 2125.02(A)(2) and 2125.03(A)(1) indicates that the probate court has the discretion to apportion the proceeds equitably according to the relative injury and loss suffered by surviving spouses, parents, and children. See *Grand Trunk Western R.R. v. Cothern*, 6th Dist. No. L-93-112, 1995 WL 112908; *In re Estate of Marinelli* (1994), 99 Ohio App.3d 372, 377-378, quoting R.C. 2125.03(A)(1) ("R.C. 2125.03 empowers the probate division to distribute the proceeds of a wrongful death award or settlement to the beneficiaries. The latter statute directs the probate court to 'adjust the share of each beneficiary in such manner as is equitable, having due regard for the injury and loss to each beneficiary resulting from the death and for the age and condition of the beneficiaries.'")

{¶23} In the case at bar, the trial court analyzed all the evidence and testimony and made a distribution of the wrongful death claim settlement proceeds on the basis of what it believed was an equitable apportionment based on the loss

suffered by both Darlene and Wayne. Consequently, we find that the trial court properly applied the law as set forth under R.C. 2125.02(A).

{¶24} Accordingly, we overrule Darlene's first assignment of error.

*Assignment of Error No. II*

{¶25} In her second assignment of error, Darlene argues that the trial court abused its discretion in awarding her only $2,000 of the wrongful death claim settlement proceeds. Specifically, she contends that the evidence and testimony presented established that she and Wayne had similar relationships with Dashelle, and, as such, that the distribution should have also been equal. We disagree.

{¶26} As set forth in our disposition of Lynch's first assignment of error, R.C. 2125.03(A)(1) grants the probate court the discretion to distribute the proceeds of the wrongful death claim equitably among the beneficiaries. *In re Estate of Werts*, 2d Dist. No. 22824, 2009-Ohio-3120, ¶13. Specifically, R.C 2125.03(A)(1) directs the trial court to "adjust the share of each beneficiary in a manner that is equitable, having due regard for the injury and loss to each beneficiary resulting from the death and for the age and condition of the beneficiaries." See also *In re Estate of Coman*, 7th Dist. No. 07-MA-181, 2008-Ohio-2266, ¶16; *In re Estate of Barnett-Clardy*, 10th Dist. No. 08AP-386, 2008-Ohio-6126, ¶22. Accordingly, an appellate court cannot overturn the trial court's distribution of the proceeds absent an abuse of that discretion. *Werts,* 2009-Ohio-

3120, at ¶13. A trial court will be found to have abused its discretion when its decision is contrary to law, unreasonable, not supported by the evidence, or grossly unsound. See *State v. Boles*, 2d Dist. No. 23037, 2010-Ohio-278, ¶¶17-18, citing Black's Law Dictionary (8 Ed.Rev.2004) 11. When applying the abuse of discretion standard, a reviewing court may not simply substitute its judgment for that of the trial court. *Blakemore v. Blakemore* (1983), 5 Ohio St.3d 217, 219.

{¶27} In the case at bar, the trial court made detailed findings from the evidence presented during the distribution hearing. Specifically, it relied upon the testimony presented that Darlene dropped off Dashelle at Wayne's residence early in the morning without notifying him; that Darlene consented to granting Wayne residential parent status and having no visitation with Dashelle unless at Dashelle's request; that Darlene was willing to have Dashelle adopted and to terminate her parental rights; that Darlene had virtually no contact with Dashelle while she was in high school; that despite Dashelle's statements to Darlene that Wayne was not allowing her to visit Darlene, she took no legal action; that Darlene was not involved in the funeral planning and refused to answer a questionnaire regarding the wrongful death action despite an attorney's request; that Darlene had not been in communication with Dashelle for several months prior to her death; and, that Darlene was not a "sincere, sad mother." (Application for Distribution Hearing Tr., p. 81)

**{¶28}** In contrast, testimony was presented that, during the time period that Wayne was not the residential parent, he exercised visitation with Dashelle and provided child support; that he was happy to see Dashelle when Darlene dropped her off at his residence, and he initiated proceedings to obtain residential parent status; that he went forward with the wrongful death action despite the chance that he might be unable to receive a recovery and could be responsible for the associated legal fees because he "didn't like the way his daughter died and didn't want somebody else to die the same way" (id. at 72); that he planned and paid for Dashelle's funeral; and, that there was never a lengthy period of time where he and Dashelle would not communicate or have contact with each other.

**{¶29}** While we recognize that Darlene presented a variety of reasons for her failures to show care or concern for Dashelle, including that she did not have the money to pursue visitation rights; that she only suggested having Dashelle adopted and giving up her parental rights to "call Dashelle's bluff" (id. at 46); and, that she did not want to be involved in the wrongful death action because she was still grieving Dashelle's death, the trial court was in the best position to judge witness credibility, *State v. Hundley,* 3d Dist. Nos. 15-09-10, 15-09-12, 2009-Ohio-6873, ¶19, and specifically made a finding of Darlene's cold demeanor while testifying and the lack of genuineness when she cried during the proceedings.

{¶30} Although this case was a difficult one, and this Court may not have reached the same conclusion as the trial court on the distribution of the wrongful death claim settlement proceeds, we cannot find that the trial court's decision was unsupported by the evidence or grossly unsound.

{¶31} Accordingly, we overrule Darlene's second assignment of error.

{¶32} Having found no error prejudicial to the appellant herein, in the particulars assigned and argued, we affirm the judgment of the trial court.

*Judgment Affirmed*

**WILLAMOWSKI, P.J. and PRESTON, J., concur.**

**/jlr**