[Cite as *In re Estate of Snider*, 2023-Ohio-3576.]

COURT OF APPEALS
STARK COUNTY, OHIO
FIFTH APPELLATE DISTRICT

|  |  | JUDGES: |
|---|---|---|
| IN RE: THE ESTATE OF: | : | Hon. W. Scott Gwin, P.J. |
| JONATHON LEE SNIDER | : | Hon. William B. Hoffman, J. |
|  | : | Hon. Andrew J. King, J. |
|  | : |  |
|  | : |  |
|  | : |  |
|  | : | Case No. 2023CA00011 |
|  | : |  |
|  | : |  |
|  | : | OPINION |

CHARACTER OF PROCEEDING:      Appeal from the Stark County Court of Common Pleas, Probate Division, Case No. 241100

JUDGMENT:      Reversed and Remanded

DATE OF JUDGMENT ENTRY:      October 3, 2023

APPEARANCES:

For: Appellant

LIPSON O'SHEA LEGAL GROUP
MICHAEL J. O'SHEA
The Hoyt Block Building
700 West St. Clair Avenue
Cleveland, OH 44113

For: Appellee

VIVIANNE W. DUFFRIN
4450 Belden Village Street N.W., Ste. 208
Canton, OH 44718

*Gwin, P.J.*

{¶1}   Appellant Tayloure Donahue appeals from the January 4, 2022 judgment entry of the Stark County Court of Common Pleas, Probate Division, which apportioned the settlement proceeds from a wrongful death action.   Thomas Snider, as custodian of I.S., is the appellee.  Diane Snider, decedent's mother, passed way during the pendency of this appeal.

*Facts & Procedural History*

{¶2}   Decedent Jonathon Lee Snider died on September 6, 2021, due to injuries he sustained as a passenger in a motor vehicle crash on September 1, 2021.

{¶3}    On October 8, 2021, decedent's mother, Diane Snider ("Diane"), filed an application for authority to open an estate for decedent in order to investigate potential wrongful death and survival claims.  Diane listed decedent's known next of kin as:  herself, Thomas Snider ("Thomas"), decedent's father, and I.S., decedent's then-nine-year-old son.  Diane was appointed as the administratrix of decedent's estate by the trial court on October 14, 2021.  Six months later, on April 8, 2022, Diane filed an amended next of kin form adding appellant, decedent's daughter, as decedent's next of kin.

{¶4}   On October 12, 2022, Diane filed an application to approve settlement and distribution of wrongful death and survival claims.  The application indicates as follows: the total amount of settlement is $1,300,000; there are funeral expenses of $7,947.82; reasonable compensation for the fiduciary is $10,000; there are subrogation claims for medical bills in the amount of $3,323.37; reasonable attorney fees are due in the amount of $433,333.33; and reasonable litigation expenses are due in the amount of $290.73. Thus, the net proceeds of $845,104.75 remained to be distributed to decedent's next of

kin.  All of the next of kin approved and consented to the amount of the settlement. However, the next of kin did not agree on how the net proceeds should be distributed. Diane filed an amended application to approve the settlement on November 16, 2022. The litigation expenses increased to $1,505.73, thus reducing the net proceeds available to $843,889.75.

{¶5}   The trial court held a hearing on December 1, 2022 to determine how the net proceeds should be distributed.

{¶6}   I.S. is ten years old and is in fifth grade.  I.S. lived with decedent prior to his death, and currently lives with decedent's parents.  I.S. testified to a close relationship with decedent, including watching movies, camping, and hanging out.  I.S. spent a lot of time with decedent every day.  Decedent told I.S. that appellant was his sister, and I.S. met her once "a while ago."  I.S. did not remember doing anything with decedent and appellant together.

{¶7}   Diane has lived with I.S. and decedent since 2017 when decedent got divorced from I.S.'s mother.  From 2017 until the time of his death, decedent had custody of I.S.  I.S. lived with decedent for I.S.'s entire life.  I.S.'s mother sees him once per month for supervised visits.  Diane and Thomas have had legal custody of I.S. since decedent's death.  Diane described I.S. and decedent's relationship as very good, with them being together on a daily basis.  In the home, decedent did all of the cooking, cleaning, maintenance, and outdoor work.  Since decedent's death, Diane has had to hire someone to maintain the lawn and perform household maintenance.  Diane has not had to hire anyone to do anything for I.S. since decedent's death.  Decedent was unemployed for a number of years due to back issues.  Diane testified decedent's death has been

emotionally devastating for her.  I.S. seems to have accepted he will never see his father again.

{¶8}   Diane last saw appellant six years ago when appellant introduced Diane to her baby.  When appellant was a baby, Diane saw her and sometimes took care of her.  However, appellant's maternal grandfather told Diane never to call appellant again.  Thus, Diane never called her again.  Diane did see appellant for a visit after appellant obtained her driver's license.  When asked when decedent last saw appellant, Diane stated, "that I could not tell you.  I couldn't tell you exactly when."  When asked if she knew whether decedent contacted appellant via his cell phone, Diane stated she did not know, as she did not have access to his cell phone, and "[had] no idea when the last time they were together."  Diane testified she was not aware of decedent's contact with appellant, but she did not dispute appellant's testimony that appellant and decedent had phone contact prior to his death.

{¶9}   Diane testified that, approximately two or three months before decedent died, appellant called and told decedent she completed an ancestry.com analysis, and decedent was not appellant's father.  Prior to his death, decedent never told Diane he wanted to do a DNA test as a result of the ancestry.com analysis.  However, Diane wanted appellant to take a DNA test after decedent passed away.  Accordingly, Diane obtained the name of an attorney in Summit County, and filed a motion for DNA testing and/or declaration that appellant was not decedent's child in the Summit County Court of Common Pleas.  Diane admitted that she knew the paternity declaration had been made more than twenty years ago, but testified she wanted to change that determination after

decedent's death.  Diane testified she did not initially list appellant as decedent's next-of-kin on the probate forms because appellant told decedent she was not his daughter.

{¶10}  Diane did not attempt to locate appellant and tell her that decedent passed away.  Similarly, Diane did not try to locate appellant or notify her about the wrongful death application or settlement.

{¶11}  Meghan Donahue ("Meghan") is decedent's sister.  She lives two hours away from her parents, and visits on holidays, birthdays, and several days during the summer.  The last time she saw appellant at her parents' house was right before appellant's last name was changed from Snider to Donahue.  Meghan also saw appellant at an Indians game when both of them happened to be there.  Meghan could not recall seeing appellant and decedent together for a long time.

{¶12}  Meghan viewed appellant and decedent's relationship as "rocky."  When asked why it was rocky, the sole reason Meghan provided was, "because of the way [appellant's] grandparents were towards my parents."  She believes the rocky relationship between her parents and appellant's maternal grandparents was the primary thing that interfered with decedent and appellant having a closer relationship.  To the best of her understanding, decedent loved appellant and wanted a relationship with her.  Meghan could not remember how many times she saw decedent and appellant together, but it was more than ten times.  Meghan testified decedent would cook, clean, do laundry, and all of the outside work at their parents' house.  Decedent cared for I.S., and was very close to I.S.

{¶13}  Rebecca Donahue ("Rebecca") is appellant's maternal grandmother.  She obtained custody of appellant when she was three years old because both decedent and

appellant's mother were using drugs. For the first five years of appellant's life, she saw decedent every other week-end. When appellant was eleven years old, decedent re-married. However, he continued to see appellant. When appellant was thirteen years old, decedent moved to Texas for several months. Upon his return, decedent would call and visit appellant. Once appellant got her driver's license, she would drive herself to visit with appellant, even after I.S. was born. Rebecca testified that appellant had regular and frequent contact with decedent when appellant was a teenager. Rebecca believes the relationship changed when appellant called children's services due to I.S.'s care. Rebecca stated decedent stopped talking to appellant for a year or two, but then resumed talking and texting with appellant.

{¶14} Rebecca agreed that appellant and decedent's relationship was sometimes rocky, but stated they loved each other. Further, that decedent loved appellant the best he knew how, given his substance abuse issues. As to appellant's name change, Rebecca testified the name change had nothing to do with appellant's relationship with decedent. Rather, appellant wanted to have the same last name as the people she lived with.

{¶15} Appellant first remembers visits with decedent when she was around five or six years old at Diane's home. From age five to ten, decedent saw appellant regularly at his own home, and he regularly took appellant camping, fishing, and on trips. Appellant felt like she did not fit in because her last name was not the name of the people she lived with, so she filed an application to change her last name. Appellant believes decedent was hurt by the name change. Appellant and decedent did not speak for approximately

one year, but then re-established a relationship. When I.S. was born, appellant spent a lot of time at her father's home, particularly in the summer.

{¶16} Appellant testified that both decedent and his then-wife had substance abuse issues. Appellant knew decedent was doing drugs when she visited him, but she wanted to visit I.S. In August of 2015, after a visit with decedent in which decedent flipped the kitchen table and screamed at appellant and I.S., appellant reported the incident to children's services. After this incident, decedent told her that his wife did not think appellant should visit anymore. However, after some time, they re-established a relationship. When appellant was nineteen years old, decedent called her and asked for money for I.S.'s school clothes and Christmas gifts. Appellant gave him money because, when she visited the home, decedent had no food and no diapers for I.S. In 2020, appellant gave decedent $250.00 to help purchase a video game console for I.S. At that time, she conversed with decedent via text message, Facebook messages, and telephone calls.

{¶17} Towards the end of his life, appellant believed decedent had a lot of "issues going on," but they still kept in contact via Facebook and text messages. Appellant described the relationship as "rocky," but still loving. When decedent passed away, appellant became very depressed. After decedent's death, she started counseling. Appellant was still going to counseling at the time of the hearing.

{¶18} As to the ancestry.com test, appellant testified that her mother told her that decedent may not be her father. Appellant called decedent and decedent told her that information may be wrong because the other putative father had been deceased for over twenty years. The ancestry.com test showed that a relative of the putative father was not

a blood relative of appellant. Appellant testified she doesn't know who her biological father is, even after the ancestry.com testing. After the ancestry.com testing, decedent and appellant continued to communicate via texts and Facebook messenger. Decedent never met appellant's son. Appellant testified she and decedent discussed them meeting, but she had concerns due to decedent's substance abuse issues.

{¶19} On cross-examination, appellant testified she saw appellant in the past few years, but not regularly. She last saw him in November of 2020. After that time, she communicated with him via calling, texting, and Facebook messenger.

{¶20} Appellant entered into evidence numerous exhibits, including: appellant's birth certificate dated July 21, 1998 and listing decedent as her father; a judgment entry from the Summit County Court of Common Pleas, Juvenile Division, finding that decedent is the biological father of appellant; a 2002 agreed judgment entry from the Summit County Court of Common Pleas, Domestic Relations Division, stating appellant's maternal grandparents were granted custody of her, with parenting time granted to decedent; a 2011 judgment entry from the Medina County Court of Common Pleas, Probate Division, changing appellant's name from Tayloure Snider to Tayloure Donahue; a motion for relief from paternity determination filed by Diane in the Summit County Court of Common Pleas, Domestic Relations Division; text messages between appellant and decedent; and photographs. In the text messages appellant sent to decedent in the fall of 2020, he apologized because he "hasn't been a great dad for the past 10 years," he told appellant, "I am so very proud of you," "no matter what, I will always love you," and "I never stopped loving you and never will." Further, decedent told appellant she was the "best" sister to I.S.

{¶21} The trial court issued a judgment entry on January 4, 2022. The trial court first found that, pursuant to R.C. 3111.25 and R.C. 3111.27, the issue of paternity as to appellant was established in the Summit County Court of Common Pleas, Domestic Relations Division, and was not rescinded.

{¶22} Next, the trial court found I.S. is entitled to a "rebuttable presumption," and that the presumption "was not rebutted" in this case because I.S. had a close relationship with decedent, spent a great deal of time with decedent, decedent was a large presence in I.S.'s life, and they shared a typical father-son bond.

{¶23} Finally, the trial court found appellant is entitled to a "rebuttable presumption." However, the court found the presumption "was rebutted" by the following testimony at the hearing: the relationship between appellant and decedent was rocky; the communication between appellant and decedent was sporadic because they "would go years without talking"; the last time they saw each other was almost a year prior to decedent's death; and decedent never met appellant's child.

{¶24} The trial court found the net proceeds should be distributed as follows: $802,739.33 and the other funds remaining following the resolution of the Medicaid lien to I.S., and $12,000 to appellant.

{¶25} Appellant appeals the judgment entry of the Stark County Court of Common Pleas, Probate Division, and assigns the following as error:

{¶26} "THE ORDER WHICH ALLOCATED ALL OF THE PROCEEDS TO I.S. IS CONTRARY TO OHIO LAW."

I.

**{¶27}** Appellant contends the trial court's allocation of the wrongful death proceeds was contrary to law. A trial court has broad discretion in apportioning wrongful death proceeds among beneficiaries. *In re Estate of Marinelli*, 99 Ohio App.3d 372, 650 N.E.2d 935 (11th Dist. Trumbull 1994). Since R.C. 2125.03 confers discretion on the probate court to distribute the proceeds of a wrongful death settlement, appellate courts will not reverse a trial court's apportionment absent an abuse of discretion. *Id.* However, appellant's argument that the court abused its discretion in the conclusions of law it reached is, in essence, a manifest weight of the evidence argument.

**{¶28}** In a manifest weight of the evidence review in a civil case, a reviewing court is to examine the entire record and determine "whether in resolving conflicts in the evidence, the finder of fact clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered." *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, 972 N.E.2d 517. "In a civil case, in which the burden of persuasion is only by a preponderance of the evidence, rather than beyond a reasonable doubt, evidence must still exist on each element (sufficiency) and the evidence on each element must satisfy the burden of persuasion (weight)." *Id.*

**{¶29}** As an appellate court we neither weigh the evidence nor judge the credibility of the witnesses. Our role is to determine whether there is relevant, competent, and credible evidence upon which the fact-finder could base its judgment. *Cross Truck Equip. Co. v. Joseph A. Jeffries Co.*, 5th Dist. Stark No. CA5758, 1982 WL 2911 (Feb. 10, 1982). Accordingly, judgments supported by some competent and credible evidence going to all essential elements of the case will not be reversed as being against the manifest weight

of the evidence. *C.E. Morris Co. v. Foley Constr. Co.*, 54 Ohio St.2d 279, 376 N.E.2d 578 (1978).

**{¶30}** R.C. 2125.03 directs the probate court to distribute wrongful death settlement proceeds in such "a manner that is equitable, having due regard for the injury and loss to each beneficiary resulting from the death and for the age and condition of the beneficiaries." There is no precise mathematical formula for apportioning wrongful death proceeds. *In re Estate of Steigerwald*, 5th Dist. Tuscarawas No. 2003-AP-10-079, 2004-Ohio-3834. Further, the surviving spouse, children, and parents of a decedent are "rebuttably presumed to have suffered damages by reason of the wrongful death." R.C. 2125.02(A).

**{¶31}** Appellee contends appellant was not decedent's biological daughter. Diane attempted to vacate the establishment of appellant's paternity after decedent's death. However, the Ohio Supreme Court has held that the term "child" as used in R.C. 2125.02(A)(1), includes all natural or adopted children, whether legitimate, legitimated, acknowledged, or illegitimate. *Brookbank v. Gray*, 74 Ohio St.3d 279, 1996-Ohio-135, 658 N.E.2d 724. R.C. 3111.13(A) provides that "the judgment or order of the court determining the existence or nonexistence of the parent and child relationship is determinative for all purposes." Further, R.C. 3111.25 provides that an acknowledgment of paternity is final and enforceable. Pursuant to these statutes and the judgment entry from the Summit County Court of Common Pleas, Juvenile Division, finding decedent is the biological father of appellant, appellant is decedent's child for purposes of Revised Code Chapter 2125. Accordingly, she is entitled to the rebuttable presumption contained in R.C. 2125.02(A).

**{¶32}** R.C. 2125.02(D) provides a non-exhaustive list of criteria upon which wrongful death damages may be awarded, including loss of support from the expected earning capacity of the defendant; loss of services of the decedent; loss of society of the decedent, including loss of companionship, care, assistance, attention, advice, counsel, instruction, training and education, suffered by the dependent children; loss of prospective inheritance to the decedent's heirs at law at the time of decedent's death; and the mental anguish incurred by the dependent children. In this case, there is no demonstration of pecuniary loss by either party. Diane testified she has not had to hire anyone to do anything for I.S. since decedent's death and that decedent was unemployed for a number of years due to back issues. Further, there is no evidence that either I.S. or appellant had a prospective inheritance from decedent. There was unrefuted testimony from appellant that she was very depressed after decedent's death and she sought counseling due to his death. There was also unrefuted evidence that decedent was I.S.'s daily caregiver.

**{¶33}** We recognize that the trial court has wide discretion in determining what is an equitable division. However, in this case, the trial court awarded I.S. 98.6% ($802,739.33, plus funds remaining after the resolution of the Medicaid lien) of the wrongful death proceeds, and appellant 1.4% ($12,000) of the wrongful death proceeds. Based upon the undisputed evidence in this case, we find this distribution is not supported by competent and credible evidence, and is an abuse of discretion.

**{¶34}** The trial court found the communication between appellant and decedent was sporadic. However, all of the testimony and evidence demonstrates that appellant and decedent had a normal father-daughter relationship until appellant was approximately fifteen or sixteen years old, with her visiting decedent regularly. Though appellant

described two one-year periods of time when they did not communicate, appellant's unrefuted testimony and the unrebutted evidence (decedent's texts) demonstrate that, after these one-year lapses, appellant and decent re-established communication. Diane testified she "could not dispute" appellant's testimony that appellant and decedent were communicating via phone and texts at the time of his death.

{¶35} The trial court next cited appellant and decedent's "rocky relationship" and lack of in-person visits to support of the 1.4% award to appellant. While the witnesses described the relationship as "rocky," none described it as non-existent or not loving. The text messages decedent wrote to appellant after the ancestry.com testing stated he never stopped loving her, and would always love her. There is unrebutted testimony about the communication between appellant and decedent in the years preceding decedent's death, and unrebutted testimony about the depression appellant suffered as a result of decedent's death.

{¶36} Additionally, the evidence demonstrates that the relationship and lack of in-person visitation was rocky due to factors outside of appellant's control. See *In the Matter of the Estate of John C.*, 10th Dist. Franklin No. 17AP-398, 2017-Ohio-8648 (award to decedent's estranged daughter to the exclusion of an award to the decedent's siblings was warranted because the estrangement was due to the acts of the decedent, not the acts of the daughter). Meghan testified the primary factor causing appellant and decedent's rocky relationship was the rocky relationship between appellant's maternal and paternal grandparents. Rebecca and appellant provided undisputed testimony that the relationship was difficult due to decedent's substance abuse issues. In the text messages, decedent apologized for not being a great father for the past ten years.

**{¶37}** The undisputed evidence presented at the hearing is that decedent acknowledged and considered appellant his daughter, and had no intention of attempting to rescind, revoke, or in any way change this acknowledgment. The evidence shows that, even after the ancestry.com testing, decedent communicated with appellant.

**{¶38}** In cases analogous to this case in which courts have affirmed large percentages of wrongful death proceeds to one next of kin when all of the next of kin involved are parties entitled to a rebuttable presumption of damages (surviving spouse, children, and parents of the decedent), there are specific facts and circumstances involved that are not present in this case. *In re Hackworth*, 3rd Dist. Hancock No. 5-93-2, 1993 WL 194122 (June 4, 1993) (surviving spouse proved an economic and pecuniary loss in excess of the proceeds available for distribution), *In re Dye*, 12th Dist. Fayette Nos. CA2011-04-004, CA2011-04-005, CA2011-04-006, 2012-Ohio-2570 (low award given to surviving spouse when marriage lasted only eight months and surviving spouse lived with her boyfriend at the time of the decedent's death), *In re Estate of Lynch*, 3rd Dist. Wyandot No. 16-10-05, 2010-Ohio-6376 (a 1.4% award to the mother of the decedent and 98.6% award to the father of the decedent was not an abuse of discretion when the mother dropped the child on the father's doorstep without notice, was willing to have her parental rights terminated and the child adopted, had no visitation, and refused to assist in the wrongful death case despite an attorney's request), *In re Estate of Barnett-Clady*, 10th Dist. Franklin No. 08AP-386, 2006-Ohio-616 (a 10% award to the decedent's father was not an abuse of discretion when the father's interaction with the decedent consisted of a handful of conversations), *In re Estate of Marinelli*, 99 Ohio App.3d 372, 650 N.E.2d 935 (11th Dist. Trumbull 1994) (a father who never initiated contact with the

decedent for over ten years prior to his death), *Engle v. Schilling*, 4th Dist. Washington No. 99CA50, 2000 WL 33226316 (Dec. 22, 2000) (a surviving spouse received a large amount of secondary benefits as a result of decedent's death that was more than each child received from the wrongful death proceeds, and the marriage was troubled and was of short duration), *In re Estate of Walter*, 9th Dist. Medina No. 2942-M, 1999 WL 82077 (Oct. 13, 1999) (no abuse of discretion when husband received 3.3% and children got the remainder because, at the time of decedent's death, she was separated from her husband and had filed for divorce).

{¶39} Further, even in cases where courts have reduced the percentage of the award to one party based upon the level of participation of each next of kin in a decedent's life, courts have allocated more than 1.4% of the wrongful death proceeds to the party who saw the decedent less frequently. *In re Estate of Barnett-Clady*, 10th Dist. Franklin No. 08AP-386, 2006-Ohio-616 (awarding 10% of the wrongful death proceeds to a father who only had a handful of conversations with the decedent); *In re Vogley*, 5th Dist. Stark No. CA-5958, 1982 WL 5601 (Dec. 14, 1982) (awarding 7% to child who had the least contact); *In the Matter of Estate of McFarland*, 6th Dist. Lucas No. L-90-357, 1991 WL 224988 (Nov. 1, 1991) (awarding 10% of wrongful death proceeds to a father who had less contact with decedent); *Estate of Haralson*, 6th Dist. Sandusky No. S-97-041, 1987 WL 102207 (Feb. 27, 1998) (15% to decedent's mother and the rest to young child). Thus, the caselaw does not support such a low award (1.4%).

{¶40} Appellant makes several arguments in her brief about the "abandonment" provision of Revised Code Chapter 2125. However, in this case, the trial court did not make a finding of abandonment. Further, the provision only applies to a "parent who

abandoned a minor child who is the decedent." R.C. 2125.02(A). In this case, the decedent is not a minor child, and appellant is not the decedent's parent. Accordingly, R.C. 2125.02(A) is inapplicable in this case.

{¶41} Further, appellant suggests in her brief that there is a "presumption of equal division where there is proof of good relationships with each child," and "the proceeds should have been divided equally between appellant and I.S." Appellant requests this Court instruct the trial court to divide the proceeds equally between appellant and I.S. However, nowhere in R.C. 2125.02 or R.C. 2125.03 is language which could be interpreted to provide a presumption of equal distribution of the proceeds. *In re Estate of Lynch*, 3rd Dist. Wyandot No. 16-10-05, 2010-Ohio-5376. Rather, the statute specifically provides that all children of the decedent are rebuttably presumed to have suffered damages, but allows the probate court discretion to distribute the proceeds in an equitable manner, "having due regard for the injury and loss to each beneficiary resulting from the death and for the age and condition of the beneficiaries." R.C. 2125.02 and R.C. 2125.03.

{¶42} We agree with appellee that there is no presumption of equal division of the proceeds. Further, that the equitable division of the proceeds should reflect I.S.'s young age, and reflect the disparity between the relative participation decedent had in I.S.'s and appellant's lives. "Logically, family members who spent significant time with decedent suffered a greater loss * * *." *In re Estate of Barnett-Clady*, 10th Dist. Franklin No. 08AP-386, 2008-Ohio-6126. There is competent and credible evidence to support a larger distribution to I.S., given the undisputed testimony concerning his age and how decedent was his daily caregiver. However, in light of the uncontroverted evidence concerning the relationship between appellant and decedent as detailed above, we find the disparity

between the distribution to I.S. (98.6%) and the distribution to appellant (1.4%) is not supported by competent and credible evidence, and is an abuse of discretion.

**{¶43}** Based on the foregoing, appellant's assignment of error is sustained.

**{¶44}** The January 4, 2022 judgment entry of the Stark County Court of Common Pleas, Probate Division, is reversed and remanded for proceedings consistent with this opinion.

By Gwin, P.J.,

Hoffman, J., and

King, J., concur